Jerome D. SALINGER a/k/a J.D. Salinger, Plaintiff-Appellant,

v.

RANDOM HOUSE, INC. and Ian Hamilton, Defendants-Appellees.

No. 657, Docket 86–7957.

United States Court of Appeals, Second Circuit.

Argued Dec. 3, 1986.

Decided Jan. 29, 1987.

Opinion Supplemented and Rehearing Denied May 4, 1987.

---

Marcia B. Paul, New York City (R. Andrew Boose, Jeremy Nussbaum, M. Graham Coleman, 2d, Kay Collyer & Boose, New York City, on the brief), for plaintiff-appellant.

Robert M. Callagy, New York City (Mark A. Fowler, Satterlee & Stephens, New York City, on the brief), for defendants-appellees.

* Judge Mansfield, originally a member of the panel, died on January 7, 1987. The appeal is being decided by the remaining members of the panel pursuant to Local Rule § 0.14(b).

Before, NEWMAN and MINER, Circuit Judges.*

JON O. NEWMAN, Circuit Judge:

This appeal presents the issue whether the biographer of a renowned author has made "fair use" of his subject's unpublished letters. The issue arises on an expedited appeal from an order of the District Court for the Southern District of New York (Pierre N. Leval, Judge) denying a preliminary injunction sought by the well-known writer, J.D. Salinger, against Ian Hamilton and Random House, Inc., the author and publisher, respectively, of a book about Salinger and his writings. For reasons that follow, we conclude that a preliminary injunction should be issued.

## Background

The plaintiff J.D. Salinger is a highly regarded American novelist and short-story writer, best known for his novel, *The Catcher in the Rye*. He has not published since 1965 and has chosen to shun all publicity and inquiry concerning his private life. The defendant Ian Hamilton is a well-respected writer on literary topics. He serves as literary critic of *The London Sunday Times* and has authored a biography of the poet Robert Lowell. In July 1983 Hamilton informed Salinger that he was undertaking a biography of Salinger to be published by Random House and sought the author's cooperation. Salinger refused, informing Hamilton that he preferred not to have his biography written during his lifetime. Hamilton nevertheless proceeded and spent the next three years preparing a biography titled *J.D. Salinger: A Writing Life.*

An important source of material was several unpublished letters Salinger wrote between 1939 and 1961. Most were written to Whit Burnett, Salinger's friend, teacher, and editor at *Story* magazine, and Elizabeth Murray, Salinger's friend. A few were written to Judge Learned Hand,[1] Sal-

1. Of historical interest is the fact that this is not the first time a prominent jurist has figured in litigation concerning the copyright protection available for private letters. In what was proba-

inger's friend and neighbor in New Hampshire, Hamish Hamilton and Roger Machell, Salinger's British publishers, and other individuals, including Ernest Hemingway.

Ian Hamilton located most, if not all, of the letters in the libraries of Harvard, Princeton, and the University of Texas, to which they had been donated by the recipients or their representatives. Prior to examining the letters at the university libraries, Hamilton signed form agreements furnished by the libraries, restricting the use he could make of the letters without permission of the library and the owner of the literary property rights. The Harvard form required permission "to publish the contents of the manuscript or any excerpt therefrom." The Princeton form obliged the signer "not to copy, reproduce, circulate or publish" inspected manuscripts without permission.

By May 1986 Hamilton had completed a version of his biography. Salinger received a set of the galley proofs of this version (the "May galleys") and learned from the galleys and the footnote citations to his letters that the letters had been donated to university libraries. In response, he took two actions. First, he registered 79 of his unpublished letters for copyright protection. Second, he instructed his counsel to object to publication of the biography until all of Salinger's unpublished materials were deleted.

In response to Salinger's objection, Hamilton and Random House revised the May galleys. In the current version of the biography (the "October galleys"), much of the material previously quoted from the Salinger letters has been replaced by close paraphrasing.[2] Somewhat more than 200 words remain quoted. Salinger has identified 59 instances where the October galleys contain passages that either quote from or closely paraphrase portions of his unpublished letters. These passages draw upon 44 of the copyrighted letters, 20 to Burnett, 10 to Murray, 9 to Hamish Hamilton, 3 to Judge Hand, 1 to Machell, and 1 to Hemingway.[3]

bly the first federal decision concerning a copyright in letters, Justice Story noted that the rights to the published letters of George Washington, which had been extensively copied in a biography, had been obtained by Chief Justice Marshall and Jared Sparks from President Washington's nephew, Justice Bushrod Washington. *See Folsom v. Marsh,* 2 Story 100, 9 F.Cas. 342, 345 (C.C.D.Mass.1841) (No. 4,901).

2. The closeness of the paraphrasing is illustrated by comparison of a passage from a 1943 letter to Whit Burnett with Hamilton's report of what Salinger had written on that occasion. Salinger, distressed that Oona O'Neill, whom he had dated, had married Charlie Chaplin, expressed his disapproval of the marriage in this satirical invention of his imagination:

I can see them at home evenings. Chaplin squatting grey and nude, atop his chiffonier, swinging his thyroid around his head by his bamboo cane, like a dead rat. Oona in an aquamarine gown, applauding madly from the bathroom. Agnes (her mother) in a Jantzen bathing suit, passing between them with cocktails. I'm facetious, but I'm sorry. Sorry for anyone with a profile as young and lovely as Oona's.

Hamilton, not content to report the fact that Salinger was distressed that O'Neill had married Chaplin or that in his mind he imagined how disastrous their life together must be, writes the following:

At one point in a letter to Whit Burnett, he provides a pen portrait of the Happy Hour Chez Chaplin: the comedian, ancient and unclothed, is brandishing his walking stick—attached to the stick, and horribly resembling a lifeless rodent, is one of Chaplin's vital organs. Oona claps her hands in appreciation and Agnes, togged out in a bathing suit, pours drinks. Salinger goes on to say he's sorry—sorry not for what he has just written, but for Oona: far too youthful and exquisite for such a dreadful fate.

Even the briefest similes are closely paraphrased. Salinger, expressing his unfavorable opinion in 1940 of presidential candidate Wendell Willkie, wrote Burnett: "He looks to me like a guy who makes his wife keep a scrapbook for him." Hamilton reports that Salinger "had fingered [Willkie] as the sort of fellow who makes his wife keep an album of his press cuttings."

3. The excerpts from the biography complained of by Salinger include one passage that Hamilton has footnoted with a reference to an additional letter to Elizabeth Murray dated December 3, 1941. However, the list of letters to Murray appearing on the copyright registration do not contain such a letter, and the paraphrased excerpt does not appear in any of the letters to Murray included in the record. This discrepancy has no bearing on our disposition of any issue in the appeal.

On October 3, 1986, Salinger sued Ian Hamilton and Random House, seeking an injunction against publication of Hamilton's biography and damages. In addition to copyright infringement, the complaint alleged unfair competition and breach of contract. The unfair competition claim was based on instances in the biography where Hamilton uses phrases such as "he states" or "he writes" to introduce close paraphrases of portions of Salinger's letters; Salinger claimed that readers would be deceived into thinking that they were reading Salinger's exact words. The breach of contract claim was based on the form agreements that Hamilton signed with the Harvard, Princeton, and University of Texas libraries. Salinger alleged that he was a third-party beneficiary of those agreements.

Judge Leval granted a temporary restraining order but subsequently issued an opinion denying a preliminary injunction. 650 F.Supp. 413 (1986). In the District Judge's view, the extent of copying of expressive material entitled to copyright protection was "minimal," amounting to "about 30 instances of the use of a word or a phrase or an image." *Id.* at 423. Building on the premise that only such fragmentary copying of protected material was involved, Judge Leval concluded that "Hamilton's appropriations of copyrighted expressions are too minimal to subject Salinger to any serious harm," *id.* at 428, and that such use as Hamilton had made was "fair use" within the meaning of the Copyright Act, 17 U.S.C. § 107 (1982). Judge Leval rejected the unfair competition claim, finding "no showing of distortions that would give rise to a Lanham Act claim." *Id.* at 427. He also rejected the contract claim, concluding that the library agreements are to be construed not to prevent all quotations but only "quotations and excerpts *that infringe copyright.*" *Id.* at 427 (emphasis in original). The claim therefore fell with the conclusion that the infringement claim was defeated by the defense of fair use. Judge Leval also noted that the letters in the Harvard and Texas libraries had not been directly quoted and that the

Princeton form did not expressly forbid quotation.

The District Court granted a limited stay, which this Court extended pending an expedited appeal.

## Discussion

■ Rulings on applications for a preliminary injunction are reviewed under an "abuse of discretion" standard, *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975); *LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir.1985). Misapplication of the appropriate legal principles constitutes grounds for overturning the denial or issuance of a preliminary injunction. See *Parents' Association of P.S. 16 v. Quinones*, 803 F.2d 1235, 1239 (2d Cir.1986); *Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 315 (2d Cir.1982); *see generally* 7 *Moore's Federal Practice* ¶ 65.04[2] at 65–48–49, ¶ 65.21 at 65–154–57 (2d ed. 1986 & Supp. 1986–87).

■ To a large extent the appropriate legal principles are not in dispute on this appeal, though their application is seriously contested. The author of letters is entitled to a copyright in the letters, as with any other work of literary authorship. *See Meeropol v. Nizer*, 560 F.2d 1061, 1069 (2d Cir.), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1977); *Folsom v. Marsh*, 2 Story 100, 9 F.Cas. 342, 346 (C.C. D.Mass.1841) (No. 4,901); 1 *Nimmer on Copyright* § 5.04 (1986); W. Patry, *Latman's The Copyright Law* 130 (6th ed. 1986). Prior to 1978, unpublished letters, like other unpublished works, were protected by common law copyright, but the 1976 Copyright Act preempted the common law of copyright, 17 U.S.C. § 301(a), and brought unpublished works under the protection of federal copyright law, which includes the right of first publication among the rights accorded to the copyright owner, *id.* § 106(3). The copyright owner owns the literary property rights, including the right to complain of infringing copying, while the recipient of the letter retains

ownership of "the tangible physical property of the letter itself." 1 *Nimmer, supra,* § 5.04 at 5–32 (footnote omitted). Having ownership of the physical document, the recipient (or his representative) is entitled to deposit it with a library and contract for the terms of access to it. As with all works of authorship, the copyright owner secures protection only for the expressive content of the work, not the ideas or facts contained therein, *see Reyher v. Children's Television Workshop,* 533 F.2d 87, 90 (2d Cir.), *cert. denied,* 429 U.S. 980, 97 S.Ct. 492, 50 L.Ed.2d 588 (1976), a distinction fundamental to copyright law and of special significance in determining whether infringement has occurred in a work of biography or other account of historical or contemporary events. *See Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 306 (2d Cir.1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 2232–34 (1967).

Central to this appeal is the application of the defense of "fair use" to unpublished works. Though common law, especially as developed in England, appears to have denied the defense of fair use to unpublished works, *see* W. Patry, *The Fair Use Privilege in Copyright Law* 436–41 (1985), the 1976 Act explicitly makes all of the rights protected by copyright, including the right of first publication, subject to the defense of fair use. *See* 17 U.S.C. § 107. That fair use applies to unpublished works does not determine, however, the scope of the defense as applied to such works. Whatever glimmerings on that subject have appeared in cases decided before May 20, 1985, *see, e.g., Diamond v. Am-Law Publishing Corp.,* 745 F.2d 142 (2d Cir.1984) (applying fair use to a letter to the editor of a newspaper, which, though not previously printed, was obviously intended for dissemination); *Sinkler v. Goldsmith,* 623 F.Supp. 727 (D.Ariz.1985); *Schuchart & Assocs., Professional Engrs., Inc. v. Solo Serve Corp.,* 220 U.S.P.Q. 170 (W.D.Tex.1983), our guidance must now be taken from the decision of the Supreme Court on that date in *Harper & Row, Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct.

2218, 85 L.Ed.2d 588 (1985), the Court's first delineation of the scope of fair use as applied to unpublished works.

The Court begins its discussion of fair use by considering the application of the doctrine to unpublished works. The Court observes that "fair use traditionally was not recognized as a defense to charges of copying from an author's as yet unpublished works," *id.* at 550–51, 105 S.Ct. at 2226 (footnote omitted), but that this "absolute rule" was "tempered in practice by the equitable nature of the fair use doctrine." *Id.* at 551, 105 S.Ct. at 2226. The Court notes that, under the Copyright Revision Act of 1976, all of the rights protected by copyright, including the right of first publication, are subject to fair use, *see* 17 U.S.C. §§ 106, 107, but explicitly rejects the contention, advanced by *The Nation,* that Congress "intended that fair use would apply *in pari materia* to published and unpublished works." 471 U.S. at 552, 105 S.Ct. at 2226. "Under ordinary circumstances," the Court states, "the author's right to control the first public appearance of his undisseminated expression will outweigh a claim of fair use." *Id.* at 555, 105 S.Ct. at 2228. This proposition was emphasized with respect to unpublished letters. Reckoning with *The Nation's* argument that fair use could permissibly be made of President Ford's unpublished memoirs because the imminent publication demonstrated that the author has no interest in nonpublication, the Court said, "This argument assumes that the unpublished nature of copyrighted material is only relevant to letters or other confidential writings not intended for dissemination," *id.* at 554, 105 S.Ct. at 2228, an assumption the Court went on to reject. Pertinent to our case is the fact that the Court underscored the idea that unpublished letters normally enjoy insulation from fair use copying.

After emphasizing the insulation of unpublished works from fair use under "ordinary circumstances," the Court considers in turn each of the four factors identified by Congress as "especially relevant," *id.* at 560, 105 S.Ct. at 2231, in determining

whether a use is fair. *See* 17 U.S.C. § 107. Reflecting its earlier discussion, the Court gives special weight to the fact that the copied work is unpublished when considering the second factor, the nature of the copyrighted work. *Id.* at 564, 105 S.Ct. at 2232–34.

Following the Supreme Court's approach in *Harper & Row,* we place special emphasis on the unpublished nature of Salinger's letters and proceed to consider each of the four statutory fair use factors. Application of these four factors points in Salinger's favor.

■ 1. *Purpose of the use.* Hamilton's book fits comfortably within several of the statutory categories of uses illustrative of uses that can be fair. The book may be considered "criticism," "scholarship," and "research." *See* 17 U.S.C. § 107. The proposed use is not an attempt to rush to the market just ahead of the copyright holder's imminent publication, as occurred in *Harper & Row.* Whether Random House plans to "exploit the headline value of its infringement," *Harper & Row, supra,* 471 U.S. at 561, 105 S.Ct. at 2231, as *The Nation* did, is not clear on the record thus far developed. Though no evidence has yet been presented on the advertising materials Random House plans to use, it is hard to believe that some emphasis will not be placed upon the fact that the book draws generously upon Salinger's unpublished letters.

We agree with Judge Leval that Hamilton's purpose in using the Salinger letters to enrich his scholarly biography weighs the first fair use factor in Hamilton's favor, notwithstanding that he and his publisher anticipate profits. However, we do not agree that a biographer faces a dilemma that entitles him to a generous application of the fair use doctrine. Judge Leval perceived the dilemma in these terms:

To the extent [the biographer] quotes (or closely paraphrases), he risks a finding of infringement and an injunction effectively destroying his biographical work. To the extent he departs from the words of the letters, he distorts, sacrificing both accuracy and vividness of description.

650 F.Supp. at 424. This dilemma is not faced by the biographer who elects to copy only the factual content of letters. The biographer who copies only facts incurs no risk of an injunction; he has not taken copyrighted material. And it is unlikely that the biographer will distort those facts by rendering them in words of his own choosing. On the other hand, the biographer who copies the letter writer's expression of facts properly faces an unpleasant choice. If he copies more than minimal amounts of (unpublished) expressive content, he deserves to be enjoined; if he "distorts" the expressive content, he deserves to be criticized for "sacrificing accuracy and vividness." But the biographer has no inherent right to copy the "accuracy" or the "vividness" of the letter writer's expression. Indeed, "vividness of description" is precisely an attribute of the author's expression that he is entitled to protect.

The point is sharply, though unwittingly, made by defendant Hamilton in the course of his deposition in this case. On cross-examination, he is pressed as to why he copied a stylistic device that Salinger had employed in one of the letters. He responds: "I wanted to convey the fact that [Salinger] was adopting an ironic term...." When the cross-examiner asks, "Couldn't you have stated that he had an ironic tone," Hamilton replies, "That would make a pedestrian sentence I didn't wish to put my name to." [4] But when dealing with copyrighted expression, a biographer (or any other copier) may frequently have to

---

**4.** This was not an ill-considered slip of the tongue. Pressed as to why he closely paraphrased Salinger's comment that Wendell Willkie "looks to me like a guy who makes his wife keep a scrapbook for him" instead of just reporting that he thought Willkie was vain, Hamilton replied, "Because that is, again, laborious, pedestrian." To avoid the "pedestrian," Hamilton reported Salinger's expression that Willkie was "the sort of fellow who makes his wife keep an album of his press cuttings."

content himself with reporting only the fact of what his subject did, even if he thereby pens a "pedestrian" sentence. The copier is not at liberty to avoid "pedestrian" reportage by appropriating his subject's literary devices.

In sum, we agree with the District Court that the first fair use factor weighs in Hamilton's favor, but not that the purpose of his use entitles him to any special consideration.

■ 2. *Nature of the Copyrighted Work.* "The fact that a work is unpublished is a critical element of its 'nature.'" *Harper & Row, supra,* 471 U.S. at 564, 105 S.Ct. at 2232. Salinger's letters are unpublished, and they have not lost that attribute by their placement in libraries where access has been explicitly made subject to observance of at least the protections of copyright law. In considering this second factor, we encounter some ambiguity arising from the Supreme Court's observation that "the *scope* of fair use is narrower with respect to unpublished works." *Id.* (emphasis added). This could mean either that the circumstances in which copying will be found to be fair use are fewer in number for unpublished works than for published works or that the amount of copyrighted material that may be copied as fair use is a lesser quantity for unpublished works than for published works. Some support for the latter view can be derived from the statement in *Harper & Row* that, though "substantial" quotations might be used in a review of a published work, the author's right to control first publication weighs against "such use" prior to publication. *Id.* However, we think that the tenor of the Court's entire discussion of unpublished works conveys the idea that such works normally enjoy complete protection against copying any protected expression. Narrower "scope" seems to refer to the diminished *likelihood* that copying will be fair use when the copyrighted material is unpublished.

The District Judge considered the nature of the copyrighted work, especially its unpublished nature, primarily in rejecting the plaintiff's argument that fair use was inapplicable to unpublished works. However, in analyzing and weighing the fair use factors, Judge Leval gave no explicit consideration to this second factor. Since the copyrighted letters are unpublished, the second factor weighs heavily in favor of Salinger.

■ 3. *Amount and Substantiality of the Portion Used.* It is with regard to this third factor that we have the most serious disagreement with the District Judge's legal analysis, both as to the pertinent standard and its application. As to the standard, we start, as did Judge Leval, by recognizing that what is relevant is the amount and substantiality of the copyrighted *expression* that has been used, not the *factual content* of the material in the copyrighted works. However, that protected expression has been "used" whether it has been quoted verbatim or only paraphrased. *See Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930), *cert. denied,* 282 U.S. 902, 51 S.Ct. 216, 75 L.Ed. 795 (1931); 3 *Nimmer, supra,* § 13.03[A] at 13–20.1. We cannot be certain that Judge Leval included close paraphrases of the Salinger letters in his determination of the quantity of copyrighted material that has been used in the Hamilton biography. At one point in his decision, Judge Leval states that he has identified "approximately 30 letters from which Hamilton has taken, either by brief quotation or *paraphrase,* a few words of copyright protected material." 650 F.Supp. at 420 (emphasis added). At other points, however, his opinion suggests that only direct quotations have been counted. Noting that Hamilton had revised the May galleys "by eliminating and writing around most of the quoted matter" previously appearing in that version of the book, Judge Leval concluded that what Hamilton accomplished "was to reduce from a large number to fewer than 30 the instances of use of copyrighted expression." *Id.* at 423. This strongly suggests that passages quoted in the May galleys but paraphrased in the October galleys were not counted as instances of use

of copyrighted expression. Moreover, of the 59 passages of the Hamilton biography complained of by Salinger, 24 contain direct quotations from the letters, perhaps constituting the "fewer than 30" instances the District Judge had in mind. Furthermore, Judge Leval states, "In the rarest case, a complete sentence is taken," *id.* at 423, citing to a passage in the October galleys that contains a full sentence quoted from one of Salinger's letters. If the District Judge had included paraphrases, he would have noticed numerous instances where the quantity of material taken from a single letter greatly exceeded a single sentence.

 Even if Judge Leval included paraphrases, we conclude that he misapplied the governing standard in determining the number of instances in which Hamilton has used Salinger's copyrighted expression. The District Judge rejected Salinger's claim of infringement as to several passages of the letters because they "employ[ed] a cliche or a word-combination that is so ordinary that it does not qualify for the copyright law's protection." *Id.* at 419. Though a cliche or an "ordinary" word-combination by itself will frequently fail to demonstrate even the minimum level of creativity necessary for copyright protection, *see, e.g., Alberto-Culver Co. v. Andrea Dumon, Inc.,* 466 F.2d 705, 711 (7th Cir.1972); W. Patry, *Latman's The Copyright Law, supra,* at 23–24, such protection is available for the "association, presentation, and combination of the ideas and thought which go to make up the [author's] literary composition." *Nutt v. National Institute Inc. for the Improvement of Memory,* 31 F.2d 236, 237 (2d Cir.1929). Or as we have more recently stated, "What is protected is the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words and the emphasis he gives to particular developments." *Wainwright Securities, Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 95–96 (2d Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978). The "ordinary" phrase may enjoy no protection as such, but its use in a sequence of expressive words does not cause the entire passage to lose protection. And though the "ordinary" phrase may be quoted without fear of infringement, a copier may not quote or paraphrase the sequence of creative expression that includes such a phrase.

 In almost all of those instances where the quoted or paraphrased passages from Salinger's letters contain an "ordinary" phrase, the passage as a whole displays a sufficient degree of creativity as to sequence of thoughts, choice of words, emphasis, and arrangement to satisfy the minimal threshold of required creativity. And in all of the instances where that minimum threshold is met, the Hamilton paraphrasing tracks the original so closely as to constitute infringement.

We have carefully analyzed all 59 of the passages from Hamilton's book cited by Salinger as instances of infringing copying from 44 of his letters. Of these 44 letters, the Hamilton biography copies (with some use of quotation or close paraphrase) protected sequences constituting at least one-third of 17 letters and at least 10 percent of 42 letters. These sequences are protected, notwithstanding that they include some reporting of facts and an occasional use of a commonplace word or expression. Hamilton's use of these sequences "exceeds that necessary to disseminate the facts," *Harper & Row, supra,* 471 U.S. at 564, 105 S.Ct. at 2232. Judge Leval found that "[i]n the rarest case a complete sentence was taken." 650 F.Supp. at 423. That is true only with respect to material directly quoted. The material closely paraphrased frequently exceeds ten lines from a single letter. Even if in one or two instances the portions of the letters copied could be said to lack sufficient creativity to warrant copyright protection, there remains sufficient copying of protected material to constitute a very substantial appropriation.

The taking is significant not only from a quantitative standpoint but from a qualitative one as well. The copied passages, if not the " 'heart of the book,' " *Harper & Row, supra,* 471 U.S. at 565, 105 S.Ct. at

2233 (quoting the District Court's opinion, 557 F.Supp. 1067, 1072 (1983)), are at least an important ingredient of the book as it now stands. To a large extent, they make the book worth reading. The letters are quoted or paraphrased on approximately 40 percent of the book's 192 pages.

In sum, the third fair use factor weighs heavily in Salinger's favor.

 4. *Effect on the Market.* The Supreme Court has called the fourth factor—effect on the market for the copyrighted work—"the single most important element of fair use." *Harper & Row, supra,* 471 U.S. at 566, 105 S.Ct. at 2234 (footnote omitted). As Judge Leval recognized, the need to assess the effect on the market for Salinger's letters is not lessened by the fact that their author has disavowed any intention to publish them during his lifetime. First, the proper inquiry concerns the "potential market" for the copyrighted work, 17 U.S.C. § 107(4), *see Pacific and Southern Co. v. Duncan,* 744 F.2d 1490, 1496–97 (11th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1867, 85 L.Ed.2d 161 (1985). Second, Salinger has the right to change his mind. He is entitled to protect his *opportunity* to sell his letters, an opportunity estimated by his literary agent to have a current value in excess of $500,000.

 Proceeding from his conclusion that only a few fragments of the letters have been used in Hamilton's book, Judge Leval expressed the view that such use would have "no effect" on the marketability of the letters. 650 F.Supp. at 425. Concluding as we do that substantial portions of the letters have been copied, we do not share the District Judge's view that marketability of the letters will be totally unimpaired. To be sure, the book would not displace the market for the letters. Indeed, we think it likely that most of the potential purchasers of a collection of the letters would not be dissuaded by publication of the biography. Yet some impairment of the market seems likely. The biography copies virtually all of the most interesting passages of the letters, including several highly expressive insights about writing and literary criticism. Perhaps few readers of the biography would refrain from purchasing a published collection of the letters if they appreciated how inadequately Hamilton's paraphrasing has rendered Salinger's chosen form of expression.[5] The difficulty, however, is that some readers of the book will gain the impression that they are learning from Hamilton what Salinger has written. Hamilton frequently laces his paraphrasing with phrases such as "he wrote," "said Salinger," "he speaks of," "Salinger declares," "he says," and "he said."[6] For at least some appreciable number of persons, these phrases will convey the impression that they have read Salinger's words, perhaps not quoted verbatim, but paraphrased so closely as to diminish interest in purchasing the originals.

The fourth fair use factor weighs slightly in Salinger's favor.

 On balance, the claim of fair use as to Salinger's unpublished letters fails. The

---

**5.** A few examples should suffice. Salinger, complaining of an editor who has rejected one of his stories though calling it "[c]ompetent handling," writes: "Like saying, She's a beautiful girl, except for her face." Hamilton paraphrases: "How would a girl feel if you told her she was stunning to look at but that facially there was something not quite right about her?"

Salinger writes: "I suspect that money is a far greater distraction for the artist than hunger." Hamilton paraphrases: "Money, on the other hand is a serious obstacle to creativity."

Salinger, conveying the adulation of Parisians toward Americans at the liberation of Paris, writes that they would have said, " 'What a charming custom!' " if "we had stood on top of the jeep and taken a leak." Hamilton paraphrases: if "the conquerors had chosen to urinate from the roofs of their vehicles."

**6.** In the District Court Salinger contended that Hamilton's use of such phrases, inserted among close paraphrases, would confuse and deceive the public, thereby creating a cause of action for unfair competition. This claim is not pursued on this appeal. Nevertheless, it is fairly arguable that the repeated use of phrases having the tendency to create the misimpression that Salinger's own words are being reported cuts substantially against any contention that Hamilton's use of the letters is "fair."

second and third factors weigh heavily in Salinger's favor, and the fourth factor slightly so. Only the first factor favors Hamilton. We seriously doubt whether a critic reviewing a published collection of the letters could justify as fair use the extensive amount of expressive material Hamilton has copied. However that may be, if fair use is to have a more "limited scope" with respect to unpublished works, it is not available with respect to the current version of Hamilton's proposed biography.

To deny a biographer like Hamilton the opportunity to copy the expressive content of unpublished letters is not, as appellees contend, to interfere in any significant way with the process of enhancing public knowledge of history or contemporary events. The facts may be reported. Salinger's letters contain a number of facts that students of his life and writings will no doubt find of interest, and Hamilton is entirely free to fashion a biography that reports these facts. But Salinger has a right to protect the expressive content of his unpublished writings for the term of his copyright, and that right prevails over a claim of fair use under "ordinary circumstances," *Harper & Row, supra,* 471 U.S. at 555, 105 S.Ct. at 2228. Public awareness of the expressive content of the letters will have to await either Salinger's decision to publish or the expiration of his copyright, save for such special circumstances as might fall within the "narrower" scope of fair use available for unpublished works, *id.* at 564, 105 S.Ct. at 2232–33. Evidently, public interest in the expressive content of the letters of a well-known writer remains substantial even fifty years after his death. *See, e.g.,* "516 Pirandello Letters Donated to Princeton," *N.Y. Times,* Dec. 29, 1986, at C13, col. 1 (reporting the great interest in the donation of the unpublished letters of Luigi Pirandello to the Princeton Library fifty years after the playright's death).

Since we conclude that the record establishes Salinger's entitlement to a preliminary injunction on his copyright claim, we need not consider at this stage of the litigation whether he is also entitled to relief by virtue of the library agreements.

Reversed and remanded with directions to issue a preliminary injunction barring publication of the biography in its present form.