## NEW ERA PUBLICATIONS INTERNATIONAL, ApS, a corporation of Denmark, Plaintiff,

v.

## HENRY HOLT & CO., INC., a New York corporation, Defendant.

### No. 88 Civ. 3126 (PNL).

United States District Court,
S.D. New York.

May 13, 1988.

Michael Hertzberg, Michael C. Elmer, Arthur J. Levine, John F. Hornick, Finnegan, Henderson, Farabow, Garrett & Dunner, Washington, D.C., for plaintiff.

Robert M. Callagy, Satterlee Stephens Burke & Burke, New York City, for defendant.

## OPINION AND ORDER

LEVAL, District Judge.

Plaintiff, New Era Publications International, ApS ("New Era"), moves for a temporary restraining order enjoining the printing, publication and distribution of a book entitled *Bare–Faced Messiah: The True Story of L. Ron Hubbard* by Russell Miller. The defendant, Henry Holt & Co., Inc. ("Holt"), is the United States publisher of the book. The plaintiff alleges that the book infringes plaintiff's copyright in unpublished and published works of L. Ron Hubbard, a well-known author and religious figure. As to unpublished copyrighted work, plaintiff contends the defense of fair comment is not available, or in any event restricted in scope. *See Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 105 S.Ct. 2218, 85 L.Ed.2d 588 (1985); *Salinger v. Random House, Inc.,* 811 F.2d 90 (2d Cir.), *cert. denied,* ——

U.S. ——, 108 S.Ct. 213, 98 L.Ed.2d 177 (1987).

I find that for reasons of strategy or neglect or both, plaintiff has been tardy in taking steps to seek this relief. As the result of plaintiff's tardiness, the grant of a temporary restraining order would subject the defendant to very great harm and loss that would have been altogether avoidable if plaintiff had moved more promptly. I conclude that plaintiff is chargeable with laches and that the temporary restraining order should not be granted for that reason.

Plaintiff's counsel brought the motion ex parte at 5:00 p.m. on May 4, 1988, and were told to return the following morning with counsel for the defendant. I spent most of the day on May 5 hearing counsel and made a preliminary ruling orally that evening. On May 6, plaintiff's counsel filed new papers seeking reconsideration. I directed response by defendant and heard counsel once again on Monday, May 9. After hearing counsel that day and considering new affidavits, I declined to change my ruling. This opinion summarizes the rulings initially set forth orally on the record.

The affidavits and representations to the court establish the following. The book, *Bare–Faced Messiah: The True Story of L. Ron Hubbard,* has already been published in the United Kingdom, Canada, and Australia. Publication in those countries occurred in the fall of 1987, despite litigation brought in those countries by plaintiff and the Church of Scientology, a religious organization to which it is related, to restrain publication on copyright and other grounds. In the Canadian litigation, an employee of the Legal Division of the Church of Scientology of California, Mr. Kenneth D. Long, apparently submitted a lengthy affidavit comparing Mr. Hubbard's unpublished documents with the alleged infringing material in Mr. Miller's book. *New Era Publications Int'l, ApS v. Levy-Porter Books Ltd.,* No. T–2433–87, at 3–4 (Federal Court of Canada, Trial Div. Dec. 2, 1987). Plaintiffs have submitted a similar affidavit by Mr. Long in this litigation. The applications for preliminary relief were denied in Canada and England. In Australia the plaintiff withdrew its suit.

Defendant's submissions indicate that plaintiff has been aware since the spring of 1986 that Mr. Miller's book would be published in the United States. Correspondence was sent in May 1986 by Jonathan Lubell, an attorney then representing the Church of Scientology and now representing plaintiff, to the publisher Henry Holt. Those letters seek to dissuade Holt from publishing the book. The correspondence includes a letter sent by Mallory Rintoul, General Counsel of Holt, to Mr. Lubell dated August 18, 1986 which suggests in strong terms that Holt will not be deterred from publication and will not be cooperative with efforts to stop publication of the book. Mr. Rintoul's letter says, "We didn't reply to your first letter, we don't intend to reply to your second letter. Don't read anything into our failure to reply except that we don't choose to reply." Essentially, it is a letter that takes an adversarial and not a conciliatory position toward the plaintiff.

In October 1987, plaintiff sent a private investigator to the defendant making overtures toward the suppression of the book, suggesting that it was defamatory and unreliable. In late 1987 plaintiff and the Church of Scientology sued in England, Canada and Australia. In mid-February 1988 Mr. Lubell wrote to the defendant asking for a copy of the book and speaking of copyright infringement. In mid-March Mr. Lubell met with the defendant, again spoke of copyright infringement, and offered to buy out defendant's rights. Holt refused the offer. The plaintiff wrote again on April 18, 1988 alleging copyright infringement. By this time, the first printing of the book was virtually completed and it was in the process of being bound and packed for shipment, which was to begin on April 27.

Never did the plaintiff take sufficient steps to obtain a copy of the book to determine whether it differed from the books published in England, Australia, and Canada. Never did the plaintiff ask Holt when it would be published. The plaintiff did not

take any legal step until May 4 when it sought the temporary restraining order. By that time, as it turned out, the defendant had published the book, having printed and packed 12,000 copies, and having sent out review copies on April 27. With the exception of 3,000 copies that a trucker had failed to collect and which were waiting on the loading dock, the first printing had been shipped beyond the publisher's control. To fill additional orders, Holt had scheduled a second print run for May 6. If that run had been cancelled, defendant would have had to wait six to eight weeks for another opening on the printer's schedule.

The plaintiff is not entitled to a temporary restraining order at this late juncture. The defendant would be severely harmed by the issuance of a TRO, blocking the second printing and distribution of the unshipped portion of the first printing. If the second printing were to be stayed, the success of the publication would be doomed to certain failure. Review copies were distributed April 27. It can be expected that, if reviewers are interested in that book, reviews will soon appear. If the second printing were held up by six to eight weeks, any interest in the book generated by the reviews could not be satisfied. No books would be available to fill orders.

As to the first printing, discussion is academic because it is beyond defendant's control. But even if defendant could still prevent its sale, plaintiff's delay would have caused defendant to incur all the costs of publication before plaintiff requested court intervention. The exaggeration of the harm to the publisher could easily have been avoided if plaintiff had acted with reasonable promptness.

The plaintiff knew for a long time it had a claim of copyright infringement. Plaintiff was aware of the publications in the United Kingdom, Canada, and Australia, all of which, according to the plaintiff's argument, were violations of the plaintiff's copyright, largely having to do with unpublished works. Against that background, the plaintiff had every reason to believe that the United States publication of the same title by the same author would be quite similar and would also involve infringements of the plaintiff's copyright. Defendant had made clear since Mr. Rintoul's defiant letter in the summer of 1986 that it had no interest either in cooperating with plaintiff or in entering into discussions of infringements. There is no good reason why plaintiff should have waited until May to seek provisional orders of restraint. An earlier application would have permitted the court to explore the issues of law without causing the defendant catastrophic harm.

Plaintiff's arguments in justification are altogether unconvincing. Plaintiff argues that it was reluctant to sue without having obtained a copy of the proposed U.S. text, lest it incur Rule 11 sanctions for suing irresponsibly. It adds that it believed Holt would be making revisions to the foreign texts to accommodate the rulings of the Supreme Court and the Court of Appeals in *Harper & Row* and *Salinger* to the effect that there is little scope for the doctrine of fair use as to *unpublished* copyrighted work.

As to plaintiff's expectation that changes of text might be made to satisfy the *Salinger* and *Harper & Row* rulings, that is no reason to delay seeking a provisional stay. *Salinger* was decided by the Court of Appeals in January 1987. If the book was being revised based on *Salinger*'s rulings on the scope of fair use of unpublished work, such revisions could have been done long ago. There was no reason for plaintiff to believe that U.S. publication would be long deferred.

Nor is there merit to plaintiff's contention it was lulled by a notation in Holt's catalogue that the book would have a July publication date. Such notations mean very little in the industry. Even accepting plaintiff's argument that a July publication date ordinarily would mean a mid-May distribution date, the defendant would have incurred most of the costs of preparation and printing by the time this lawsuit was filed. More importantly, plaintiff never even asked Holt how close it was to publi-

cation and when distribution could be expected.

As to concern for Rule 11 sanctions, this is unconvincing and incredible. The publication of the same title in Britain, Canada and Australia gave the plaintiff a firm basis for the expectation that U.S. publication would be substantially similar. But if plaintiff did not wish to apply for a TRO without having seen the U.S. version, it could easily have lodged the suit and obtained the text by discovery, before asking court intervention staying publication.

I suspect the real reason for the delay had more to do with a strategic concern which plaintiff's counsel acknowledged. The book had apparently sold poorly in England, Canada and Australia. Plaintiff was concerned that the lodging of a suit might draw attention to this unfavorable book and might increase its sale potential in the United States. The decision to delay legal action was probably attributable to strategy. Plaintiff hoped the book might simply die. Rather than bring suit, plaintiff preferred to keep its options open. This was a reasonable tactic. A suit might well have helped the sale of a book which plaintiff considered defamatory to L. Ron Hubbard. But if plaintiff delayed for tactical reasons, and the delay resulted in exposing the publisher to extreme and avoidable harm from a temporary order of restraint, plaintiff must bear the consequences of its delay.

Defendant has convincingly demonstrated, on the present state of the record, that plaintiff's laches should bar the grant of a TRO. Plaintiff may proceed with discovery in the event it wishes to pursue its application for a preliminary injunction.

Motion denied.

SO ORDERED.