**Robert CRAFT, Plaintiff,**

v.

**John KOBLER and Macmillan, Inc., Defendants.**

**No. 87 Civ. 2601 (PNL).**

United States District Court, S.D. New York.

Aug. 6, 1987.

Frankfurt, Garbus Klein & Selz, P.C., New York City, for plaintiff; Richard Kurnit, Jay Wishingrad, Robert Kraus, Maura Wogan, of counsel.

Jan F. Constantine, Richard M. Constantine, New York City, for defendants.

LEVAL, District Judge.

This is an action for copyright infringement brought to enjoin a new, as yet unpublished, biography of the composer Igor Stravinsky written by John Kobler. The book is entitled *Firebird, A Biography of Igor Stravinsky* ("*Firebird*"). A motion for a preliminary injunction, which was heard on an expedited basis, seeks to stay the distribution of *Firebird,* pending final adjudication. The motion for a preliminary injunction is granted.

The plaintiff is Robert Craft. For the last twenty years of Stravinsky's life, Craft

3

**122**

was his amanuensis, personal assistant and closest intellectual and musical confidant. He was a member of the Stravinsky household and became virtually an adoptive son to the Maestro and Mrs. Stravinsky. Craft is the author or co-author of approximately 15 copyrighted books on Stravinsky. These include several books written by Craft alone,[1] several co-authored by Craft and Stravinsky,[2] four "conversation" books written in the form of interviews of Stravinsky by Craft,[3] a three-volume compendium of Stravinsky's correspondence with explanatory text and annotations by Craft,[4] and one co-authored by Craft and Stravinsky's widow.[5] [The Stravinsky books authored or co-authored by Craft are here referred to as the "Craft-Stravinsky Writings."]

The defendants are Kobler and Macmillan Inc., the publisher of *Firebird*. Kobler is a professional writer of 50 years' experience. He has written several biographies and over 60 magazine articles. His *Firebird* manuscript is of approximately 120,000 words. The most recent printed bound galleys prepared by Macmillan present a book of 337 pages. Kobler has spent in excess of two years researching and writing *Firebird*. His research included approximately 80 interviews and the reading of hundreds of books and articles. He does not dispute that the Craft-Stravinsky Writings are a very important source of his information, nor that his book frequently quotes from them.

*Firebird* is richly stocked with quotations of Stravinsky taken from the Craft-Stravinsky literature. Although Craft is not the author of the Stravinsky portions of his books, so that his copyright would

not normally cover them, Stravinsky willed to Craft his own copyright in those books.[6] This suit is brought primarily to protect the Stravinsky copyright interest which Craft inherited. To a lesser extent, the suit also involves Craft-written material.

\*　\*　\*　\*　\*　\*

Upon Craft's institution of this lawsuit, plaintiff and defendants entered into a voluntary standstill agreement to allow adequate time for presentation of a motion for preliminary injunction. Plaintiff presented a two-column table setting forth in the one column the complete text of plaintiff's allegedly infringed material and, side-by-side, the full text of the Kobler passage cited as infringing. Plaintiff's initial table presented 230 instances of alleged infringement. The defendants reproduced the table, adding a third column in which defendants summarize their contentions as to why each instance should not be considered an infringement. As to some, defendants contended that Craft does not own the copyright in the allegedly infringed material. After review of defendants' arguments, plaintiff dropped a number of his specifications, reducing the number of claimed instances of infringement from 230 to 167. Defendants, on the other hand, have conceded by stipulation Craft's copyright ownership in some of the works initially questioned.

The hearing on the motion for preliminary injunction was by submission. The principal submissions are the comparative table; a stipulation of facts; depositions of Craft and of Kobler; the complete manuscript of *Firebird*, and fourteen of the volumes of the Craft-Stravinsky Writings.

\*　\*　\*　\*　\*　\*

1. Craft, *Prejudice in Disguise* (1974); Craft, *Present Perspectives* (1984); Craft, *Stravinsky: The Chronicle of a Friendship* (1972).

2. Stravinsky & Craft, *Dialogues and a Diary* (1963); Stravinsky & Craft, *Retrospectives and Conclusions* (1969); Stravinsky & Craft, *Themes and Episodes* (1966).

3. Stravinsky & Craft, *Conversations with Igor Stravinsky* (1959); Stravinsky & Craft, *Dialogues* (1982); Stravinsky & Craft, *Expositions and Developments* (1981); Stravinsky & Craft, *Memories and Commentaries* (1960).

4. I Stravinsky: *Selected Correspondence* (R. Craft ed. 1982); II Stravinsky: *Selected Correspondence* (R. Craft ed. 1984); III Stravinsky: *Selected Correspondence* (R. Craft ed. 1985).

5. Stravinsky & Craft, *Stravinsky in Pictures and Documents* (1978).

6. It appears from a stipulation of the parties that Craft also owns an interest in the copyright in numerous articles written by Stravinsky.

The most important part of the assessment of such a claim is a careful word-for-word comparison of the texts. To make this comparison I have read the Craft-Stravinsky passages cited as infringed not only in the table but together with the surrounding material in the source volume so as to understand the context. I have, likewise, read each cited Kobler passage in its context, and have compared the two word-for-word. I have read the Kobler biography to assess the role and importance of the accused passages and to evaluate the defendants' claims of fair use.

On a copy of the comparative table, which is filed as an appendix to this opinion, using a letter code with accompanying comments, I have ruled as to each portion of each cited passage whether it represents an instance of infringement.[7]

■■■ The propositions that govern a suit of this nature are in the main well established, although their application can be disputed. When a biographer or historian, using a copyrighted work as a source, takes historical information from it, he does not infringe the copyright. The law does not recognize private ownership of historical information, *see Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 978 (2d Cir.), *cert. denied*, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980); *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir.1966), *cert. denied*, 385 U.S. 7009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); 1 M. Nimmer, *Nimmer on Copyright* § 2.11[A] (1986) (hereinafter *Nimmer*); nor does it enforce efforts to hoard, suppress, sell or license historical fact, or to govern who may and who may not disseminate it. Thus, the copyright law does not protect research. Notwithstanding that enormous effort and great expense may have been required to discover factual information, it may, nonetheless, be freely taken from the original writer's copyright-ed work and republished at will without need of permission or payment. *Rosemont Enterprises*, 366 F.2d at 309–10. What the copyright law protects is rather the author's craftsmanship and art in the presentation of the material. It is the manner of expression and not the factual content that enjoys copyright protection. *See Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 105 S.Ct. 2218, 2224, 85 L.Ed.2d 588 (1985); *Financial Information, Inc. v. Moody's Investors Service*, 751 F.2d 501, 505 (2d Cir.1984).

In *Firebird* there is no doubt a large amount of factual information about Stravinsky that Kobler acquired from the extensive Craft-Stravinsky literature. Such takings, however, do not constitute infringement. Passages that reflect a permissible taking of information, without misappropriation of the craft of authorship (by quotation or paraphrase), are designated in the appendix by the letter A.

■■■ Similarly, ideas are not protected by copyright; although the distinction can be difficult to isolate, it is the manner of expressing the idea and not the idea itself that is protected. *See Hoehling*, 618 F.2d at 978 (interpretation of historical event not copyrightable); *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 389 (2d Cir.1960) (Hand, J.); 1 *Nimmer* § 203[D]. In the appendix table, B designates a taking of unprotected ideas.

■■■ The copyright protection extends only to work created by the original copyright holder. A writer who in an otherwise protected work quotes another person cannot claim protection for the quoted passage. *See Suid v. Newsweek Magazine*, 503 F.Supp. 146, 148 (D.D.C.1980); *Rokeach v. Avco Embassy Pictures Corp.*, 197 U.S.P.Q. 155, 161 (S.D.N.Y.1978). Kobler's use of quotes of third persons taken from the Craft-Stravinsky sources are designat-

---

7. In a few instances where ruling would require a further factual inquiry into the condition or ownership of the copyright in the allegedly protected work (or some other extrinsic fact) and where resolution of the question was unnecessary to the overall decision presented by this motion, I have indicated alternative possible rulings. In a few instances where ruling would involve a doubtful judgment call as to whether, for example, a paraphrasing of protected material was sufficiently close as to represent infringement, I have indicated the tentative quality of the ruling.

ed C. These do not infringe Craft's copyrights.[8]

Direct quotation or copying of a copyrighted work is, of course, an infringement unless justification is shown. 17 U.S.C. § 106 (1982). Direct quotes and copying are designated in the table by D.

■ Protected writing is also infringed by paraphrase which remains sufficiently close that, in spite of changes, it appropriates the craft of authorship of the original. *See Salinger v. Random House, Inc.*, 811 F.2d 90, 97 (2d Cir.1987); 818 F.2d 252, 254 (2d Cir.1987); *Donald v. Zack Meyer's T.V. Sales and Service*, 426 F.2d 1027, 1030 (5th Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 459, 27 L.Ed.2d 411 (1971); *Werlin v. Reader's Digest Assoc., Inc.*, 528 F.Supp. 451, 463 (S.D.N.Y.1981). Kobler paraphrases that I have found sufficiently close to the Craft-Stravinsky source to constitute infringement are designated E.

Where no sufficient similarity of expression is shown between Kobler's passage and a Craft-Stravinsky source to justify a finding of infringement, I have used the letter I.

As to many passages, Kobler asserts the defense of fair use. *See* 17 U.S.C. § 107 (1982). The circumstances justifying a conclusion of fair use are discussed below. Passages used in a manner that supports a conclusion of fair use are marked J in the table.

The letters F, G and H are used with respect to claims of copyright in a translation, designating respectively infringing quotation, paraphrase which is so close as to infringe and more remote paraphrases or takings of substance that do not trespass on the copyright.

\*   \*   \*   \*   \*   \*

### Appropriations of Copyrighted Material

■ The plaintiff has shown 72 instances in Kobler's book of infringement by copying or direct quotation of copyrighted material owned by Craft; there are another 17 instances of direct quotation for which the defendants initially questioned whether Craft owns an enforceable copyright in the original. By stipulation, however, defendants eventually conceded Craft's copyright ownership in several works which removes the doubt for 7 of these passages[9], giving a total of 79 infringements by quotation of passages concededly under plaintiff's copyright (or 80 including a contested passage from a Vera Stravinsky letter for which Craft has demonstrated his ownership).[10] (Many of Kobler's 79 passages include portions that infringe by close paraphrase in addition to the portions that infringe by quotation.)

■ I have found 10 additional passages where Kobler employed a paraphrase that sufficiently tracks or emulates the manner of expression of material concededly under Craft's copyright as to justify a conclusion

**8.** Plaintiff contends many passages presented by Stravinsky as quotes of third persons should more accurately be seen as Stravinsky's narrative inventions based on events far in the past. The point has some merit, but presents puzzling problems of adjudication, especially when the author who quotes is dead. In part because nothing turns on the question for this motion, I have credited Stravinsky's attribution to third persons at face value and have not considered these passages as protected Stravinsky authorship.

**9.** As to Nos. 6 and 186 in the table, defendants contend that the plaintiff failed to show copyright ownership by reason of a prior publication in the *New York Review of Books*. By stipulation, however, Kobler later conceded that Craft owns a joint interest in the copyright for the *New York Review of Books* material. Likewise, Kobler initially challenged item no. 8, arguing

prior publication in a 1960 article by Stravinsky in the *New Yorker* magazine. By stipulation, Kobler also conceded Craft's interest in the copyright to the *New Yorker* article.

As to items nos. 13, 26, 29 and 41, Kobler initially asserted that Craft had failed to show a copyright in the source work, *Conversations with Igor Stravinsky*. Since then, however, Craft has apparently produced the certificate of registration, and Kobler has stipulated Craft's ownership.

**10.** Craft has demonstrated his copyright in a contested item, No. 226, involving a letter written by Vera Stravinsky. A portion of this letter was published after Vera's death in a book copyrighted by Craft, from which Kobler quotes a three-word phrase. Vera Stravinsky's will leaves "all [her] literary rights" as well as her personal papers and correspondence and the remainder of her estate to Craft. (Joint Ex. 35.)

of infringement. As to 3 further passages that are close enough to infringe by paraphrase, defendants contest plaintiff's ownership of the copyright.

There are additional passages of paraphrase which may be sufficiently close to infringe, but are subject to reasonable disagreement. For example, where the accused passage draws unprotected history from the protected work, the fact that the narration of events is structured in the same order although by different words and expression has been found to justify a conclusion of "close paraphrase" and infringement in *Salinger*, 811 F.2d at 98; *see also Salinger*, 818 F.2d 252, 254 (2d Cir. 1987) (per curiam); whereas *Hoehling*, 618 F.2d at 978, quoting an early opinion of Judge Learned Hand, *Myers v. Mail & Express Co.*, 36 C.O. Bull. 478, 479 (S.D.N.Y.1919), ruled that "there cannot be any such thing as copyright in the order of presentation of the facts, nor, indeed, in their selection." *See also* 1 *Nimmer* § 2.11[D]. For purposes of this motion, I have given the defendants the benefit of the doubt on those paraphrases.

For this ruling, I rely only on the 89 passages noted above (involving approximately 3,500 words) [11] in which I have found infringement by quotation or paraphrase where plaintiff's ownership of the copyright is conceded. The doubtful cases and those of questioned ownership have been excluded from the basis of this opinion.

A further issue of infringement arises as to the translations of letters written in Russian by Stravinsky, his first wife Catherine and others. Many such translations appear in the Craft-Stravinsky literature, especially the *Selected Correspondence*. A number of extracts are quoted verbatim in *Firebird;* a further number are paraphrased, in some cases very closely.

Craft does not contend he owns a copyright in the original letters. He claims a copyright in the translations, which defendants dispute. Craft does not speak Russian and did not translate the letters himself. According to his testimony, however, he hired students of Russian to make literal translations of the letters, and thereafter he reworked the language, exercising his own authorship to achieve a diction he considered suitable. Especially in the case of letters written by Stravinsky, Craft claims to have recast the translations in such a way as to imitate the unusual manner in which Stravinsky spoke English. His claim of copyright depends on his personal revisions of the translations, or alternatively on the theory that the hired translators were performing "work for hire." *See* 17 U.S.C. § 201(b) (1982).

Recognizing the incomplete state of the record on the motion for preliminary injunction, the evidence seems to favor Craft as to his possession of a copyright interest in these translations. If he exercised original authorship reworking the translations, he is eligible for copyright protection in the final rendition, notwithstanding that the earlier translation from Russian was done by others. Furthermore, if he hired students to translate the letters for his book and they were subject to his direction and supervision, he would have a reasonable claim of authorship based on the theory of "work for hire." *See Aldon Accessories, Ltd. v. Spiegel, Inc.*, 738 F.2d 548 (2d Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 387, 83 L.Ed.2d 371 (1984); 1 *Nimmer* § 5.03[B][1][a]. Defendants rely on the fact that Craft did not claim "work for hire" on the certificate of registration. Nonetheless, if the facts sustain his position and if it appears that the misstatement was inadvertent, little turns on the error; the copyright is not thereby invalidated, nor is the certificate of registration rendered incapable of supporting the action. *See* 2 Nimmer § 7.20. In any event, the letters are insignificant on the question of plaintiff's entitlement to a preliminary injunction. Three are quoted directly. A few leave a question whether their paraphrase remains too close to the original. On the issue of defendants' claim of fair use, the letters are but a drop in the

---

11. Unlike the count of infringing passages, the word count includes infringing paraphrases included in a passage containing an infringing quotation.

bucket of infringing passages mentioned above. The ruling on this motion is therefore made without reference to them.

*Fair Use*

In seeking to justify his takings from the Craft-Stravinsky Writings, Kobler argues that he has made "fair use" of the protected material. Fair use is a judicially created doctrine which is expressly recognized in Section 107 of the Copyright Act of 1976. 17 U.S.C. § 107 (1982); *see generally* W. Patry, *The Fair Use Privilege in Copyright Law* (1985). According to this statute,

> [n]otwithstanding [the exclusive rights of the copyright owner specified in] the provisions of section 106, the fair use of a copyrighted work ... for purposes such as criticism, comment, news reporting, teaching ... scholarship, or research, is not an infringement of copyright.

The statute goes on to instruct that "the factors to be considered" in determining whether fair use is applicable "shall include—

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

> (2) the nature of the copyrighted work;

> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

> (4) the effect of the use upon the potential market for or value of the copyrighted work."

17 U.S.C. § 107 (1982); *see also Nation Enterprises*, 105 S.Ct. at 2231.

The first statutory factor directs attention to the "purpose and character of the use." This factor calls for examination of how the particular taking of protected material serves the instructive goals that the fair use doctrine seeks to promote.

Three cited passages are excellent examples of takings that carry a particularly strong claim of fair use:

■ In No. 203, Kobler discusses whether it was in fact Craft who wrote much of the late writings of Stravinsky.

Kobler observes that there were huge differences in the way Craft and Stravinsky expressed themselves. He then quotes a 45–word sentence attributed to Stravinsky in *Dialogues*, a Stravinsky-Craft conversation book. Kobler suggests the sentence is in the style of Craft's diction and altogether unlike Stravinsky's. He reinforces the speculation of Craft's authorship of Stravinsky's books by reference to a memoir by Stravinsky's secretary who tells that the Stravinsky book materials she typed were handed to her by Craft and revised by Craft and that, so far as she was aware, Stravinsky never saw them. Kobler relates the question of authorship to the deeply complex relationship between Stravinsky and Craft and the importance of that relationship to Stravinsky. To my mind, there can be little doubt that the verbatim quotation of a 45–word sentence lifted out of context from a full-length book for these purposes is entitled, absent powerful countervailing factors, to be considered fair use. Since the point depends on a perception of the style of writing and manner of expression, it could not be made effectively without direct quotation.

A similar conclusion applies to item No. 204. Now exploring a different facet of the Stravinsky-Craft relationship, Kobler argues that at times Craft took as his own words that originated in Stravinsky. He cites an original Craft diary entry attributing to Stravinsky the observation that peacocks on a lawn in Cuernavaca looked like "Ziegfield girls." Kobler then quotes a phrase from a Craft book in which he refers to those "peacocks strutting like Ziegfield girls."

In both instances, it is important for Kobler to quote the copyrighted material to support the instructive historical purpose on which his fair use claim is grounded. Furthermore, the amount taken for these illustrative purposes is modest and reasonable; the loss to the copyright owner of the benefit of protection is minimal. The claim of fair use would, of course, be abused by quoting an entire chapter to support the argument that the writing style suggested Craft's and not Stravinsky's authorship.

The third convincing claim of fair use is no. 230 where Kobler quotes Craft for the purpose of impeaching, rather than adopting, his statement. For nos. 203, 204 and 230, the claim of fair use is sufficiently strong that I did not mark those passages as infringing.

But few of Kobler's quotations of Stravinsky advance such persuasive claims of a fair use purpose. More common are takings of Stravinsky's radiant, startlingly expressive phrases to make a richer, better portrait of Stravinsky, and to make better reading than a drab paraphrase reduced to bare facts. A few examples follow:

In describing the mourners at Stravinsky's funeral, Kobler mentions Leopold Stokowski, adding a description Stravinsky had written of him:

"He looked like a sleek Russian wolfhound then, and only later, in his film-star years, when he must have spent an hour a day trying to find a perfect bisexual hairdo, and disheveling it in exactly the right way, did he ever appear to be ungroomed." [No. 1.]

Of Stravinsky's childhood memories of St. Petersburg:

"... the droshkies on cobblestones or wooden-parquetry pavements ... the horse-drawn streetcars and, in particular, the rail-scraping noise they made as they turned the corner near our house and whipped up speed to cross the Krukov Canal bridge ... the cries of the vendors ... especially those of the Tartars, though, in truth, they did not so much cry as cluck.... But the most memorable street cry of all was the knife grinder's: 'Tocheet nozhi, nozhui, pravir!' ('Sharpen your knives and scissors, strop your razors!') ... the cannonade of bells from the Nikolsky Cathedral near our house...." [No. 8.]

Of an early piano teacher:

"She ... was an excellent teacher and a blockhead, by which I mean that her aesthetics and bad taste were impregnable and her pianism of a high order." [No. 15.]

On his memory of his first wife Catherine, from whom he had lived mostly apart as she was confined by tuberculosis to a sanitarium in Switzerland while Stravinsky, achieving brilliant successes throughout Europe and America, was more often in the company of the beautiful Vera Sudeikina, whom he married after Catherine's death:

"We were from then on until her death extremely close, and closer than lovers sometimes are, for mere lovers may be strangers though they live and love together all their lives." [No. 24.]

In narrating a strange dream Stravinsky experienced while composing Firebird, in which, according to Kobler, a virgin was sacrificed to the God of Spring, Kobler adds a quotation from an unrelated Stravinsky passage:

that "violent Russian spring that seemed to begin in an hour and was like the whole earth cracking." [No. 34.]

Quoting Stravinsky on the lack of musical precedent for *The Rite of Spring:*

"I had only my ear to help me; I heard and wrote what I heard. I am the vessel through which *The Rite* passed." [No. 39.]

On the opportunistic manipulation of wealthy patrons:

"The trick ... is to compose what you want to compose and get it commissioned afterwards." [No. 52.]

On the composer Manuel de Falla:

"a man even smaller than myself, and as modest and withdrawn as an oyster.... His nature was the most unpityingly religious I have ever known, and the least sensible to manifestations of humor. I have never seen anyone so shy." [No. 55.]

On Aldous Huxley:

"the most aristocratic man I have ever known, and I do not mean in the sense of birth.... Aldous is an aristocrat of behavior. He is gentle, humble, courageous, intellectually charitable. Of the learned people I know, he is the most delectable conversationalist, and of that breed he is one of the few who are always droll...." [No. 153.]

And on Christopher Isherwood:

"Everything about Isherwood is boyish ... his looks, his laugh, his candor, even the Americanisms—'gee,' 'gosh,' in his speech.... His eyes are his most striking feature; they look through you and beyond—all the way up to Karma...." [No. 155.]

In support of Kobler's quotation of such examples of Stravinsky's wit and power of description, the defendants argue that for a biography or critical study of an author, the doctrine of fair use gives latitude to quote protected matter for the purpose of illustrating and communicating the subject's powers of observation and expression.

Surely there is merit to the argument. Nor is it contradicted by the recent admonition of the Court of Appeals in *Salinger:* "This dilemma [of choosing between loss of accuracy and vividness and risking an injunction] is not faced by the biographer who elects to copy only the factual content of letters. The biographer who copies only facts incurs no risk of an injunction; * * * [W]hen dealing with copyrighted expression, a biographer ... may frequently have to content himself with reporting only the fact of what the subject did, even if he thereby pens a 'pedestrian' sentence. The copier is not at liberty to avoid 'pedestrian' reportage by appropriating his subject's literary devices." 811 F.2d at 96–97. Taken out of context this passage appears to bar the biographer of an author from using any of his subject's protected expression whether done to achieve accuracy in the rendition of the subject's idea or to illustrate comments on the subject's writing style, skill and power. The biographer would be restricted to telling his readers, "This Mickey Spillane, boy, he sure can write."[12] He would not be permitted to take examples of protected material to illustrate the point. A full reading of the *Salinger* opinion makes clear, however, that this discussion refers only to takings from *unpublished* copyrighted material, as to which the court ruled there is little opportunity for fair use.

■ I agree with the defendants that the fair use doctrine gives latitude to the biographer of an author to quote limited excerpts of published copyrighted work to illustrate the descriptive skill, wit, power, vividness, and originality of the author's writing.

But the license is not unlimited. In assessing claims of fair use, we must consider the number, size and importance of appropriated passages, as well as their individual justifications.

■ The quantity of appropriated material is expressly raised by the third statutory factor, which considers "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3) (1982). Defendants argue that the appropriated segments are but a tiny percentage of the extensive Craft-Stravinsky Writings of over 2 million words, and, likewise, that the appropriations from each Craft-Stravinsky title are but a tiny fraction of that work.

The argument is not convincing. In the first place, the factors listed in the statute are not exclusive. The fact that the statute speaks in terms of the relationship between "the portion used" and "the copyrighted work as a whole" does not mean that a word count fraction derived from those numbers is the only relevant approach to the issue of the substantiality of the appropriation. In *Nation Enterprises,* the Supreme Court gave no importance to the fact that the appropriated words were "an insubstantial portion" of the copyrighted whole. It employed a qualitative rather than a numerical assessment, agreeing with District Judge Owen's finding that the portion taken "was essentially the heart of the book." 105 S.Ct. at 2233, *quoting* 557 F.Supp. 1067, 1072 (S.D.N.Y.1983). The Court noted also that the quoted passage constituted a substantial portion (13%) of the infringing article and was the most significant part of it. 105 S.Ct. at 2233–34.

---

**12.** Chayefsky, *Marty.* The *Salinger* opinion suggests that rather than quote from a Salinger letter to convey the irony of his tone, the biographer might simply have stated that he used an ironic tone. 811 F.2d at 96–97.

In my view, Kobler's takings are far too numerous and with too little instructional justification to support the conclusion of fair use. Kobler uses Stravinsky's colorful words without restraint throughout the book to describe and comment on the events and personages of Stravinsky's life. Most of these passages do not individually present a compelling justification of fair use. By a conservative count (that includes neither the doubtful rulings, cases of disputed ownership, nor claims based on translations), the appropriations constitute approximately 3% of the volume of Kobler's book. The importance of these passages to the book far exceeds that percentage. Stravinsky's colorful epigrams animate the narrative. I think Kobler might agree that they are the liveliest and most entertaining part of the biography.

■ The remaining statutory factors direct attention to "the nature of the copyrighted work" and "the effect of the [alleged infringer's] use upon the potential market for or value of the copyrighted work." I find that these factors also favor the plaintiff.

All the books in question, plaintiff's fifteen and defendants', are about Stravinsky. Most of them include a great deal of biographical or autobiographical anecdote. I recognize that portions of Craft's and Stravinsky's writings are on a different level of sophistication from Kobler's and are aimed at a different readership. They include sophisticated discussions of musical theory, while Kobler acknowledges in his preface that he is "neither a musician nor a musicologist" and has "not ventured to analyze Stravinsky's prodigious work." Kobler has written a popular book, aiming for the book clubs, the general public and the best seller list.

Expressing disdain for Kobler's musically unsophisticated general-audience biography, Craft has been reluctant to acknowledge competition between his works and *Firebird*. Plaintiff has therefore argued the "market" factor less forcefully than he might have.

But to a considerable extent, these books are in potential competition. In the first place, a large portion of the material in the Craft-Stravinsky books is anecdotal, well within the reach of the general readership. One book, *Stravinsky in Pictures and Documents*, by Craft and Vera Stravinsky, is a glossy coffee table volume, full of entertaining photographs, playbills, drawings, memorabilia and anecdotes. The flyleaf on Craft's *Dialogues and a Diary* advises that the book is "filled with stories of exotic places and anecdotes about some of this century's most dedicated artists." A reader seeking an informative biographic or autobiographic book of Stravinsky anecdotes and memorabilia might well have difficulty choosing between defendant's and several of plaintiff's titles. And upon reading the Kirkus Review of *Firebird*, describing it as a "treasure trove of Stravinsky recollections," *see Kirkus Reviews*, April 21, 1987 (Jt. Ex. 16), he might find that choice all the more difficult.

The fact that plaintiff's books are out of print and that Craft testified he had no interest in writing further on Stravinsky is not determinative. *See* 17 U.S.C. § 107 (1982) ("effect ... upon the *potential* market....) (emphasis supplied); *Salinger*, 811 F.2d at 99 (*opportunity* to market book protected). As public interest in Stravinsky increases, the Craft-Stravinsky books may be reissued. Craft might also license a new book drawing extracts from his various copyrighted titles. Depending on the selection of extracts, such a book might well aim at a general readership and compete directly with defendants'. I conclude defendants' book is potentially in competition with plaintiff's copyrighted material and that the second and fourth factors argue at least slightly against a finding of fair use.

\*    \*    \*    \*    \*    \*

■ In *Salinger*, I observed that "[e]njoining publication of a book is a serious matter," 650 F.Supp. 413, 426 (S.D.N.Y.1986), *rev'd*, 811 F.2d 90 (2d Cir.1987). I continue to hold that view. The Court of Appeals' ruling in that case, rejecting the biographer's claim of fair use and directing an injunction, has little bearing on this dispute because it turned on the Court's

perception that fair use has minimal application to takings from unpublished work.

Nonetheless, I conclude that *Firebird's* appropriations of copyrighted material are too extensive and important, and their justification too slight to support an overall claim of fair use. Having satisfied both branches of the *Jackson Dairy* test, *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979) (per curiam), plaintiff is entitled to a preliminary injunction.[13] This ruling does not kill Kobler's biography but may require revisions reducing the use of Stravinsky's prose.

SO ORDERED.

---

**13.** In this Circuit, where the plaintiff has established a prima facie case of copyright infringement, the showing of irreparable injury need not be detailed; irreparable injury is normally presumed. *See Wainwright Securities, Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 94 (2d Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978); *Wales Industrial, Inc. v. Hasbro Bradley, Inc.,* 612 F.Supp. 510, 520–21 (S.D.N.Y.1985) (Weinfeld, J.). The defendants' contention that Craft could be adequately compensated for any infringement by a damage award is unpersuasive. I find that the plaintiff would be irreparably harmed through publication of the infringing work.

Although there is no doubt that restraining publication of *Firebird* pending trial imposes a great hardship on the defendants, I also find that the balance of hardships tip decidedly in the plaintiff's favor.

A question might arise as to whether Craft seeks to suppress *Firebird* not for copyright reasons but because it includes unfavorable comments on him. Abuse of the copyright remedies might weigh against the granting of equitable relief. I need not reach this issue, however, because defendants have made no such showing.