**NEW ERA PUBLICATIONS INTERNATIONAL, ApS,**
Plaintiff,

v.

**CAROL PUBLISHING GROUP and Jonathan Caven–Atack,**
Defendants.

No. 89 Civ. 3845 (LLS).

United States District Court, S.D. New York.

Jan. 30, 1990.

(5th Cir.1977) (Clayton Act authorizes nationwide extraterritorial service).

## OPINION AND ORDER

STANTON, District Judge.

Plaintiff New Era Publications International ("New Era") moves pursuant to Fed. R.Civ.P. 65 to enjoin defendants Carol Publishing Group ("Carol") and Jonathan Caven–Atack[1] from publishing an unauthorized biography of the late L. Ron Hubbard.

## BACKGROUND

New Era is the exclusive licensee of the works of Mr. Hubbard, a prolific and controversial author and founder of the Church of Scientology (the "Church"). Mr. Hubbard, who died in 1986, has written books on such diverse topics as science fiction, philosophy and religion. New Era has gone to considerable lengths to protect the copyrights to Mr. Hubbard's works, instituting suits in the United States, England, Canada and Australia.

Mr. Atack is the author and Carol is the publisher of *A Piece of Blue Sky* (the "book"), a critical biography of Mr. Hubbard. Mr. Atack was a member of the Church for almost nine years, during which he spent a great deal of time, money and effort studying Church teachings and pursuing its ideals. (Affirmation of Jonathan Caven–Atack dated September 29, 1989 ("Atack Aff.") Exhibit A at 1).

Mr. Atack became disillusioned with the Church after discovering what he perceived to be abusive practices against dissident Church members. (*Id.* at 1–2). After a thorough investigation, Mr. Atack came to believe that Scientology is a dangerous cult and that Mr. Hubbard, far from being the gentle prophet portrayed in Church literature, was a paranoid, vindictive and profoundly disturbed man. (*Id.* at 2–5). He wrote the book to expose what he believes to be the pernicious nature of the Church and the deceit that is the foundation of its teachings. (*Id.* at 6–7).

New Era learned that Carol intended to publish the book and, having reason to

Jonathan W. Lubell, Morrison Cohen Singer & Weinstein, New York City, for plaintiff.

Melvin L. Wulf, Beldock Levine & Hoffman, New York City, for defendants.

1. Mr. Atack has not been served with a summons and complaint in this action, nor has he entered an appearance. (Affirmation of Jonathan Caven–Atack dated September 29, 1989 ¶ 2).

believe that it would contain copyrighted materials, New Era brought this action to prevent its publication. (Affidavit of Jonathan Lubell sworn to September 14, 1989 ¶ 3, 4 & 11). Over its objection, Carol was ordered to produce the manuscript of the book to New Era. Review of the manuscript disclosed substantial quotation from copyrighted material and New Era moved for a preliminary injunction. The parties subsequently agreed to merge the proceedings for preliminary and permanent injunctions pursuant to Fed.R.Civ.P. 65(a)(2).

According to New Era, 121 passages of the book are taken from 48 copyrighted sources. (Affidavit of Kenneth Long sworn to September 14, 1989 ("First Long Aff.") ¶ 8 & Exhibit A; Affidavit of Kenneth Long sworn to October 17, 1989 ("Second Long Aff.") ¶ 3). These passages total 4,324 words, which is approximately 2.9% of the total words in the book.[2] (First Long Aff. ¶ 8). New Era asserts that two of the passages, totalling 33 words, are from unpublished materials, although Carol contends that these materials have been published. Carol also claims that some of the works allegedly infringed by the book are, for various reasons, not appropriate subjects for a copyright action.

New Era asserts, as it has in another action to enjoin a biography of Mr. Hubbard, that it has been authorized to publish a biography of Mr. Hubbard that will draw from both his published and unpublished writings. (Affidavit of Carl Heldt sworn to September 14, 1989 ("Heldt Aff.") ¶ 7); *New Era Publications Int'l v. Henry Holt and Co.*, 695 F.Supp. 1493, 1522 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 576 (2d Cir.1989). It contends that publication of the book will seriously impair the market for this biography. (Heldt Aff. ¶ 7).

New Era asserts that publication of the biography would infringe on the copyright of Mr. Hubbard's works in violation of 17 U.S.C. §§ 106, 501 (1988). Carol contends that the use of the copyrighted materials is protected by the "fair use" privilege embodied in 17 U.S.C. § 107.[3]

## DISCUSSION

### I. Validity of Certain Copyrights

■ Carol contends that New Era has not submitted proof of registration of six works, representing nine of the passages that New Era claims come from copyrighted sources. (Defendant's Supplemental Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction at 2).[4] "Registration of a copyright claim is a jurisdictional prerequisite to a suit for infringement." *Wales Industrial, Inc. v. Hasbro Bradley, Inc.*, 612 F.Supp.

---

2. New Era arrived at this figure by counting the words on each of the first ten pages following the book's introduction to determine the average number of words per page. It then multiplied this figure by the number of pages in the book, resulting in an estimate of 147,000 words in the book. (First Long Aff. ¶ 5).

New Era has prepared a schedule comparing each of the copyrighted materials in the book with the Hubbard quotation from which it was taken. (*See id.* ¶ 6 & Exhibit A). New Era asserts that in making its calculation of the total number of words Mr. Atack takes from copyrighted materials, it has only counted those words that are quoted or closely paraphrased. (Second Long Aff. ¶ 7).

3. Section 107 states:

Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified in that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringe-

ment of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.

4. Carol originally asserted that New Era had not provided proof of registration for other copyrights that the book would allegedly infringe. (*See* Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction at 8). New Era filed an amended complaint establishing registration of these materials.

510, 515 (S.D.N.Y.1985) (footnote omitted). However, New Era has demonstrated that it has registered these six works. (*See* Affidavit of Kenneth Long sworn to November 2, 1989 ("Third Long Aff.") ¶ 4).[5]

■ Carol also contends that the copyright of one of the materials, the *HCO Manual of Justice*, (the *"Manual"*) has expired. The *Manual* contains 18 of the allegedly infringed passages, totalling approximately 389 words. Carol contends that because the *Manual* was published in 1959, the 28–year copyright term provided for in the Copyright Act of 1909[6] (the "1909 Act") expired in 1987.

The Copyright Act of 1976 (the "1976 Act") states that any copyright that was in its first term on January 1, 1978 "shall endure for twenty-eight years from the date it was originally secured." 17 U.S.C. § 304(a). Under section 10 of the 1909 Act, an author secured a copyright by publishing a work with a copyright notice. Section 19 required that the copyright notice indicate the year in which the copyright was secured by publication. The copyright notice in the *Manual* indicates that it was published in 1959, although the work was not registered until September 14, 1989. (Affirmation of Melvin Wulf dated October 24, 1989 Exhibit A).

New Era states that the copyright has not expired because, the copyright notice notwithstanding, the *Manual* is unpublished. (Third Long Aff. ¶ 5). Under section 26 of the 1909 Act, the date of publication is the date when copies are "placed on sale, sold, or publicly distributed." New Era notes that there is a blank in its copyright application in the space provided for the date of publication and the registration form states that the date of publication is to be included "ONLY if this work has been published." (First Verified Amended Complaint Exhibit B–54 (emphasis in original)).

However, New Era had previously asserted that the work is published. (Heldt Aff. ¶ 4). New Era fails to offer an explanation for the date on the copyright notice or its earlier assertion that the *Manual* is published. Because the *Manual* was published with a copyright notice in 1959, its copyright expired in 1987. Accordingly, that work is no longer entitled to copyright protection and the passages from it contained in the book will not be considered in determining New Era's claim of infringement. *See Harvey Cartoons v. Columbia Pictures Industries, Inc.,* 645 F.Supp. 1564, 1571 (S.D.N.Y.1986).

## II. Fair Use

■ The book takes many passages from copyrighted sources. It infringes New Era's copyright unless copying the passages is a fair use. *See Harper & Row Publishers, Inc. v. Nation Enterprises,* 471 U.S. 539, 569, 105 S.Ct. 2218, 2235, 85 L.Ed.2d 588 (1985) (defendant conceded that its quotation of 300 words was infringement "unless excused as a fair use.").

The privilege of fair use, a common-law doctrine codified in section 107 of the 1976 Act, allows a reasonable use of copyrighted materials without the consent of the owner. *Harper & Row,* 471 U.S. at 549, 105 S.Ct. at 2224 (quoting H. Ball, Law of Copyright and Literary Property 260 (1944)). The nature of the privilege is summed up in Justice Story's classic statement of the doctrine:

> [A] reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism. On the other hand, it is as clear, that if

---

**5.** Carol has also asserted that some of the claimed copyrights are invalid because they were filed by the executor of Mr. Hubbard's estate and there is no showing that the executor has authority to act with regard to these works. However, New Era has demonstrated the executor's authority with respect to Mr. Hubbard's literary property. (*See* Third Long Aff. ¶ 2 & Exhibit A).

New Era has also demonstrated that several copyrights are valid even though they were registered in Mr. Hubbard's name after his death. (*See* Third Long Aff. Exhibit 3).

**6.** The Copyright Act of 1909 was repealed and replaced with the Copyright Act of 1976, Pub.L. No. 94–553, 90 Stat. 2541 (1976).

he thus cites the most important parts of the work, with a view, not to criticize, but to supersede the use of the original work, and substitute the review for it, such a use will be deemed in law a piracy.

*Folsom v. Marsh,* 9 F.Cas. 342, 344–45 (C.C.D.Mass.1841) (No. 4,901) (cited in *Harper & Row,* 471 U.S. at 550, 105 S.Ct. at 2225). Section 107 was intended merely to codify the common law doctrine, not to modify it. *See Harper & Row,* 471 U.S. at 549, 105 S.Ct. at 2224.

Section 107 allows the fair use of a copyrighted work "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research." 17 U.S.C. § 107. It sets out four nonexclusive factors used to determine whether a use is fair: (1) the purpose and character of the use, including whether it is being published for profit; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used compared to the copyrighted work as a whole; and (4) the effect on the potential market of the copyrighted work. *Id.*

## A. *The Purpose and Character of the Use*

■ Carol's potential profit from its use of copyrighted materials "tends to weigh against a finding of fair use." *Harper & Row,* 471 U.S. at 562, 105 S.Ct. at 2231. Yet the mere fact that a work may produce pecuniary gain for its author or publisher is not dispositive of a claim of fair use. *See Maxtone–Graham v. Burtchaell,* 803 F.2d 1253, 1262 (2d Cir.1986), *cert. denied,* 481 U.S. 1059, 107 S.Ct. 2201, 95 L.Ed.2d 856 (1987). Such an absolute rule would severely restrict the operation of the fair use doctrine, as virtually all publications involve some profit motive. *Ibid.* Thus the Second Circuit has stated when previously analyzing a claim of fair use by a biographer of Mr. Hubbard that "[a]s long as a book can be classified as a work of criticism, scholarship or research, as can the book here, the factor cuts in favor of the book's publisher." *New Era,* 873 F.2d at 583. As this general statement suggests, the overall purpose and character of the use of copyrighted materials in the book tends to favor a finding of fair use.

However, many of the specific uses of copyrighted materials serve no fair use purpose. *See Craft v. Kobler,* 667 F.Supp. 120, 126 (S.D.N.Y.1987) (analysis of purpose and character of use "calls for examination of how the particular taking of protected material serves the instructive goals that the fair use doctrine seeks to promote."). Passages from copyrighted works are often set off by themselves at the beginning of a part or chapter. (*See* First Long Aff. Exhibit A, passages 1, 2, 5–6, 9, 21, 34, 39, 51–52, 75, 85, 102, 107, 109–110, 119). The evident purpose of this device, which is carried out with some effect, is to use passages from Mr. Hubbard's work to set the tone for the sections they precede. In essence, these passages use copyrighted materials as a literary device rather than as a basis for a critical study of Mr. Hubbard. They therefore serve a very weak fair use purpose. *Cf. Sony Corp. of America v. Universal City Studios, Inc.,* 464 U.S. 417, 455 n. 40, 104 S.Ct. 774, 795 n. 40, 78 L.Ed.2d 574 (1984) (although not determinative, productive nature of use "may be helpful in calibrating the balance" of fair use).

For example, the following quotation from Mr. Hubbard's poem *Hymn of Asia* precedes a section about his early life:

Appoint Amongst you
Some small few
To tell about me lies
And invent wicked Things
And spread out infamy
Abroad and Within
And to stand before
Our altars
And insult and
Lie and tell
Evil rumors about us all.

(First Long Aff. Exhibit A, passage 5).

Mr. Atack states that the purpose of this quotation is to show "Hubbard's concern, and indeed paranoia, that he would be misrepresented." (Atack Aff. Exhibit B, ¶ 5).

However, Mr. Atack does not analyze this quotation and what it reveals about Mr. Hubbard. No comment or criticism is directed at it. The passage is merely set forth, for readers to make of it what they will. The quotation itself is gratuitous: whatever illuminating effect its presence may give from mere juxtaposition, that effect rests on copyright infringement since it is put to no "use." Rather, the passage serves only as a backdrop for the section which follows it. Such quotations reproduce the work of Mr. Hubbard, rather than serve the scholarship, criticism, comment or research of Mr. Atack; thus their use is essentially predatory rather than fair. *See Maxtone-Graham*, 803 F.2d at 1260 (" '[t]here must be real, substantial condensation of the materials, and intellectual labor and judgment bestowed thereon; and not the facile use of the scissors' " (citing *Folsom*, 9 F.Cas. at 345)).

Similarly, the book contains the following quotation: "All that Ethics [sic] is for ... is simply that additional tool necessary to make it possible to apply the technology of Scientology. Man does not have that purpose for his law or his justice. He wants to squash people who are giving him trouble." (First Long Aff. Exhibit A, passage 109 (omission in Atack book)). This quotation precedes a section of the book that details Mr. Hubbard's alleged use of lawsuits to obstruct and harass those who opposed him, and is followed immediately by another substantial quotation set off as a chapter heading.

The use of such quotations cannot be justified as "ironic" (Atack Aff. Exhibit B, ¶ 109), or as demonstrating, without further comment, Mr. Hubbard's paranoia (*id.* ¶ 5). The effect is that Mr. Hubbard's expressions frame and inspire Mr. Atack's book: to this extent it is Mr. Hubbard, not Mr. Atack who is the author of the book, and that is not fair use but infringement.

Nor are other uses of copyrighted materials warranted. Some of the quotations of Mr. Hubbard's factual accounts do not contribute to the accuracy of the book or otherwise serve a fair use purpose. (*See* First Long Aff. Exhibit A, passages 7, 10, 18).

For example, the book quotes the following: "In the isolation of the high hills of Tibet, even native bandits responded to Ron's honest interest in them and were willing to share with him what understanding of life they had." (*Id.* passage 10). The avowed purpose of this quotation is to show falsehood, because Mr. Hubbard was never in Tibet. (Atack Aff. Exhibit B, ¶ 10). Clearly, Mr. Atack could make that simple point by using only the facts and not the ebullient verbiage of Mr. Hubbard's passage. *See Salinger v. Random House, Inc.*, 811 F.2d 90, 96–97 (2nd Cir.1987).

> Mr Atack quotes the following passage: Blinded with injured optic nerves, and lame with physical injuries to hip and back, at the end of World War II, I faced an almost nonexistent future. My Service record stated: "This officer has no neurotic or psychotic tendencies of any kind whatsoever," but it also stated "permanently disabled physically."
>
> And so there came a further blow—I was abandoned by family and friends as a supposedly hopeless cripple and a probable burden upon them for the rest of my days. I yet worked my way back to fitness and strength in less than two years, using only what I knew about Man and his relationship to the universe. I had no one to help me; what I had to know I had to find out. And it's quite a trick studying when you cannot see.
>
> I became used to being told it was all impossible, that there was no way, no hope. Yet I came to see again and walk again.

(First Long Aff. Exhibit A, passage 18). Mr. Atack's explanation for using this quotation is that it is false. (Atack Aff. Exhibit B, ¶ 1). While facts may be conveyed in this passage, its effect is to appropriate Mr. Hubbard's grandiose and extravagant expressions. For the limited purpose of challenging the "facts" in it, Mr. Atack could have stated the substance of Mr. Hubbard's assertions. *See Salinger*, 811 F.2d at 96 (biographer could have copied only facts to avoid injunction). The result might have been a colorless sentence indeed, but (under Second Circuit precedent

which controls this court) an author "is not at liberty to avoid 'pedestrian' reportage by appropriating his subject's literary devices." *Id.* at 97.

In sum, many of the passages lack any allowable fair use purpose. They often are only used as topic headings, as signals in Mr. Hubbard's words of the subject Mr. Atack will next address. That is not a fair use but an appropriation. To that extent the purpose and nature of the use strongly favors New Era.

## B. *The Nature of the Copyrighted Work*

### 1. Published and Unpublished Sources

New Era claims that two of the passages are from unpublished materials. The scope of the fair use privilege is much narrower with regard to such materials. *See Harper & Row*, 471 U.S. at 564, 105 S.Ct. at 2232; *Salinger*, 811 F.2d at 97. However, Carol has demonstrated that both passages come from published sources. One of the passages appeared in a newspaper article in 1984. (*See* Atack Aff. ¶ 7, Exhibit D). The other appeared in Mr. Hubbard's book, *What is Scientology*. (*Id.* at ¶ 8).

### 2. Factual and Creative Materials

■ "Facts cannot be copyrighted." *Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir.1983) (citing 17 U.S.C. § 102(b)), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). When a copyrighted work is factual, others may quote it more liberally. *Harper & Row*, 471 U.S. at 563, 105 S.Ct. at 2232. In such cases quotation can be necessary "adequately to convey the facts." *Ibid.*

A biography by definition purports to be a factual account, and many of the allegedly infringing passages are from statements Mr. Hubbard contended were historical facts. (*See, e.g.*, First Long Aff. Exhibit A, passages 8–9, 11–17, 50, 77–78, 87, 89, 95). Many of these passages relate to the account of Mr. Hubbard's travels as a young man and his participation in the Sec-

ond World War. Mr. Atack contrasts them to his own version of events, and therefore some verbatim quotation is necessary for accuracy.

Mr. Atack uses other quotations to expound Mr. Hubbard's scientific theories. (*See, e.g., id.*, passages 22–25, 31–32, 38, 43, 49, 79). For example, Mr. Hubbard asserted that a person who followed his teachings and attained the status of a "Clear" could do a computation which a "normal [person] would do in half an hour, in ten or fifteen seconds." (*Id.*, passage 23). Quotation of such factual assertions is entitled to broad fair use protection. *See Weissmann v. Freeman*, 868 F.2d 1313, 1325 (2d Cir.) (plurality opinion), *cert. denied*, —— U.S. ——, 110 S.Ct. 219, 107 L.Ed.2d 172 (1989); *Maxtone–Graham*, 803 F.2d at 1263–64.

However, many of the passages in the book are from Mr. Hubbard's creative and philosophical writings. (*See e.g.*, First Long Aff. Exhibit A, passages 1–2, 6, 21, 33, 41, 51, 54, 75, 84–85, 109, 113, 117).[7] Most of these quotations are not necessary to assure accuracy. Instead, they are used for their expressive content.

For example, Mr. Atack quotes the following:

> The hardest task one can have is to continue to love one's fellows despite all the reasons he should not ...
>
> A primary trap is to succumb to invitations to hate. There are those who appoint one their executioners. Sometimes for the sake of the safety of others, it is necessary to act, but it is not necessary also to hate them.

(*Id.* passage 84) (omission in Atack book). Mr. Atack describes this statement as hypocritical. (Atack Aff. Exhibit B ¶ 84). However, the passage is essentially expressive rather than factual, and the nature of the passage weighs against a finding that its use is fair.

Mr. Atack also appropriates Mr. Hubbard's expression in the following passage:

---

**7.** Not all of the passages from copyrighted sources have been categorized here as factual or creative. Much of his work does not lend itself to such neat characterization. (*See, e.g.*, First Long Aff. Exhibit A, passage 3).

"My purpose is to bring a barbarism out of the mud it thinks conceived it and to form, here on Earth, a civilization based on human understanding, not violence. That's a big purpose. A broad field. A star-high goal. But I think it's your purpose, too." (First Long Aff. Exhibit A, passage 2). Mr. Atack uses this passage to demonstrate "the false public face of Scientology." (Atack Aff. Exhibit B ¶ 2).

The use of the first sentence of this passage is arguably necessary to relate accurately the professed purpose of Scientology, and to that extent the quotation is factual. However, the remainder of the quotation appropriates Mr. Hubbard's expression about these purposes and is superfluous to a factual discussion of them.

Similarly, Mr. Atack quotes the following passage:

It is definitely none of my business how you apply these techniques. I am no policeman ready with boards of ethics and court warrants to come down on you with a crash simply because you are 'perverting Scientology.' If there is any policing to be done, it is by the techniques themselves, since they have in themselves a discipline brought about by their own power. All I can do is put into your hands a tool for your own use and then help you use it.

(First Long Aff. Exhibit A, passage 54). This passage contains several factual assertions by Mr. Hubbard. However, Mr. Atack uses the entire quotation, rather than culling the facts from the expressive materials in which they are contained.

Because these and so many other quoted passages are expressive rather than factual materials, this factor favors New Era. *See Harper & Row*, 471 U.S. at 563–64, 105 S.Ct. at 2232 (use of copyrighted matter "whose power lies in the author's individualized expression.... exceeds that necessary to disseminate the facts.").

C. *Amount and Substantiality of the Portion Used Compared to the Copyrighted Work as a Whole*

The parties strongly dispute the appropriate method of applying this factor. The language of the statute indicates the appropriate measure is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107(3). However, courts have used a number of different comparisons when analyzing this factor. *See e.g., Harper & Row*, 471 U.S. at 564–66, 105 S.Ct. at 2232–33 (assessing quality and quantity of taking; measuring quality as importance of quoted material to both copyrighted work and infringing work and quantity as percentage that copyrighted materials constitute of infringing work); *Salinger*, 811 F.2d at 98–99 (measuring quality as importance of copyrighted work to infringing work and quantity as portion of copyrighted work taken); *Maxtone–Graham*, 803 F.2d at 1263 (assessing quality by importance of materials taken to copyrighted work and quantity by percentage of copyrighted work taken); *Consumers Union*, 724 F.2d at 1050 (measuring quantity as portion of copyrighted work taken); *Meeropol v. Nizer*, 560 F.2d 1061, 1070–71 (2d Cir.1977) (measuring quantity as percentage that copyrighted materials constitute of infringing work), *cert. denied*, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978); *Craft*, 667 F.Supp. at 128–29 (assessing quality by importance of copyrighted materials to infringing work and quantity as percentage that copyrighted materials constitute of infringing work).

Of course, these courts have not used these various methods because of indifference to the statutory language. Instead, these differing approaches indicate that courts make a pragmatic analysis of this factor, considering both the quality and quantity of the copyrighted materials used and conscious that the factors listed in section 107 are not exclusive. *See id.* at 128.

In *Harper & Row*, the Supreme Court stressed the "qualitative nature of the taking" in determining substantiality. *Harper & Row*, 471 U.S. at 565, 105 S.Ct. at 2233. In that case The Nation magazine published an article using excerpts from a stolen manuscript of President Ford's memoirs. *Id.* at 543, 105 S.Ct. at 2221.

Because the allegedly infringing passages played a "key role in the infringing work," the Court held that the taking was substantial. *Id.* at 566, 105 S.Ct. at 2233. *See also Salinger*, 811 F.2d at 99 (quoted passages were substantial because they "make the [infringing] book worth reading").

The Atack book uses Mr. Hubbard's materials in a qualitatively significant way. As stated above, passages from copyrighted works are often set off by themselves at the beginning of a part or chapter in order to set a general tone.[8] In *Harper & Row*, the Court found it significant that the Nation article was "structured around the quoted excerpts which serve as its dramatic focal points." 471 U.S. at 566, 105 S.Ct. at 2233. Mr. Atack makes much the same use of some of the materials taken from Mr. Hubbard's copyrighted sources.

The other quotations from copyrighted sources are in the text of the book. Unlike the copyrighted materials in *Harper & Row*, these quoted passages are not " 'essentially the heart' " of Mr. Hubbard's copyrighted work. *Id.* at 565, 105 S.Ct. at 2233 (quoting district court opinion, 557 F.Supp. 1067, 1072 (S.D.N.Y.1983)). Still, they are "an important ingredient of the book as it now stands." *Salinger*, 811 F.2d at 99. The focus of the book is frequently on the difference between Mr. Atack's portrayal of events and Church teachings and Mr. Hubbard's. Thus the importance of the copyrighted material to the Atack book weighs in favor of New Era.

The quantity of copyrighted material used reinforces this conclusion. Mr. Atack has taken passages from a substantial number of Mr. Hubbard's copyrighted sources. Under these circumstances, it is of little value to measure this taking solely by the amount of copyrighted materials in the book as compared to the volume of the source materials from which they were taken. *See Craft*, 667 F.Supp. at 128–29 (rejecting strict application of this factor in case involving takings from numerous

works of author). Such an analysis would reduce copyright protection for authors merely because their materials are lengthy or the body of their work is prodigious; it would conflict with the goal of encouraging authors' creative endeavors. *See Harper & Row*, 471 U.S. at 545–46, 105 S.Ct. at 2222–23; *Sony Corp.*, 464 U.S. at 429, 104 S.Ct. at 782.

There are slightly less than 4,000 copyrighted words in the book.[9] While this figure is insignificant when compared to the total words in all the copyrighted sources from which they were taken, it represents approximately 2.7% of the volume of Mr. Atack's book. Moreover, the book uses a rather large percentage of some copyrighted sources. In sum, the quoted passages comprise a small, but significant element of the book, and accordingly this factor favors New Era.

### D. *Effect on the Market*

This factor looks to the effect on the potential market for the copyrighted work. New Era asserts that it plans to produce an authorized biography of Mr. Hubbard which will include both his published and unpublished writings. (Heldt Aff. ¶ 7). It contends that the book will seriously impair the market for the authorized biography. (*Ibid.*). The 1976 Act protects the markets for both the original Hubbard source materials and any derivative materials such as New Era's forthcoming biography. *See Harper & Row*, 471 U.S. at 568, 105 S.Ct. at 2234 (effects on potential markets for original and derivative works are relevant when determining fair use).

The Second Circuit has previously addressed the effect on the market for New Era's anticipated biography when analyzing another unauthorized biography of Mr. Hubbard which contained his copyrighted materials. *See New Era*, 873 F.2d at 583. In that case, the infringing book contained a number of passages from unpublished works. The court held that " 'some impair-

---

**8.** *See supra* pp. 996–97.

**9.** This figure results from subtracting the approximately 389 words taken from the *HCO*

*Manual of Justice* from New Era's count of words taken from copyrighted materials in the book, as the copyright on that work has expired.

ment of the market seems likely,'" and that this factor weighed slightly in New Era's favor. *Ibid.* (quoting *Salinger,* 811 F.2d at 99).

Unlike the biography at issue in *New Era,* here the book does not contain any copyrighted materials from unpublished works. No consumer will be drawn to the book because it contains materials that are unavailable elsewhere. New Era's biography might lose sales to consumers who are reluctant to read two accounts of Mr. Hubbard's life, even if written from different perspectives. Other consumers might decide not to purchase New Era's biography because of the book's negative portrayal of Mr. Hubbard. However, these effects do not result from Mr. Atack's use of copyrighted materials; the book could adversely affect the market for New Era's biography in those ways even if it contained no copyrighted materials at all.

Still, there may be some effect on the market for the copyrighted works because of the book's use of protected materials. Consumers may find after reading the book that they have gotten a sufficient flavor of Mr. Hubbard's writings to deter them from buying the source materials. *Cf. Salinger,* 811 F.2d at 99 (reading excerpts of unpublished letters may "diminish interest in purchasing the originals."). Others may wish to purchase a biography of Mr. Hubbard that contains his writings, and may select the book rather than wait until New Era publishes the authorized biography. Still others might become interested in the subject and stimulated to buy Mr. Hubbard's works. Thus publication of the book could have some effect on the market for the copyrighted works.

In other contexts, the effect on the market has been described as the most important factor in fair use analysis. *See Harper & Row,* 471 U.S. at 566, 105 S.Ct. at 2233; *Salinger,* 811 F.2d at 99. However, in those cases the effect on the market from the alleged infringement was clearer than it is here. In *Harper & Row,* for example, The Nation's use of a stolen, unpublished manuscript had both immediate and tangible effects on the market for President Ford's memoirs. 471 U.S. at 567, 105 S.Ct. at 2234. In *Salinger,* the court of appeals recognized that use of Salinger's unpublished letters might affect their future value, notwithstanding Salinger's disavowal of any desire to publish them during his lifetime. 811 F.2d at 99.

Here, any effect on the market for New Era's forthcoming biography is speculative. Accordingly, this factor does not favor either party.

———

To summarize, the first three fair use factors favor New Era and the fourth favors neither party. While section 107 "does not, and does not purport, to provide a rule which may automatically be applied in deciding whether any particular use is 'fair,'" D. Nimmer & M. Nimmer, 3 Nimmer on Copyright § 13.05[A], at 13–65 (1989), Carol has not pointed to any other cogent rationale favoring publication. Indeed, relevant equitable considerations indicate New Era is entitled to an injunction. *Cf. New Era,* 873 F.2d at 595–97 (Oakes, C.J., concurring) (decision whether to enjoin publication is governed by "traditional equitable principles"). In contrast to a prior action to enjoin a critical biography of Mr. Hubbard, here New Era diligently asserted its rights. *See Id.* at 584–85 (injunction denied because of laches). The book is still in manuscript form, so deletion of the infringing passages will be relatively simple and inexpensive.

The only apparent hardships resulting from an injunction are some delay in publication and a more stringent editing process. These do not overcome the general rule that an infringer should be enjoined. *See Wainwright Securities Inc. v. Wall Street Transcript Corp.,* 558 F.2d 91, 94 (2d Cir.1977), *cert. denied,* 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978) (irreparable harm is normally presumed if infringement is demonstrated).

## CONCLUSION

There is a difference between published and unpublished works, even if it is no more than that the use of an unpublished writing misappropriates not only the ex-

pression itself but also the author's decision whether to publish it. *Harper & Row*, *Salinger* and *New Era* should be read with that difference in mind. Even so, in this case there is too often republication without that criticism or illumination which comprises fair use rather than infringement.

New Era's motion for preliminary and permanent injunctions is granted. The book may not be published in its present form. Plaintiff may submit a form of judgment on consent or on notice.